Filed 5/23/25  In re A.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | D084994 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15940) |
| v. | |
| J.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed in part, conditionally reversed in part, and remanded with directions.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

This is the third appeal filed by J.H. (Mother) in this dependency matter involving serious physical harm A.L. (Minor) suffered, or was at risk to suffer, from Mother's excessive disciplinary practices. Mother's first appeal from the juvenile court's jurisdictional order was dismissed. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) In her second appeal, we affirmed the juvenile court's finding at the contested six-month review hearing that it would be detrimental to return Minor to Mother's care. (*In re A.L.* (Jan. 6, 2025, D084095) [nonpub. opn.].)

Mother now appeals a finding of detriment at the contested 12-month review hearing. She again contends substantial evidence does not support the court's finding that it would still be detrimental to return Minor to Mother's care. We again disagree. Substantial evidence supports the court's finding that it would not be safe to return Minor because Mother still has not engaged in important components of her case plan designed to eliminate the reasons for detention. We, thus, affirm this portion of the order.

However, Mother also contends that the Agency and the court did not adequately inquire of Father R.L. or extended paternal family members about whether Minor is an Indian child[1] as required by the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and Welfare and Institutions Code[2] section 224.2. The Agency concedes conditional reversal is prudent to ensure proper ICWA inquiry.[3]

---

[1]     We use the term "Indian" to remain consistent with language used in the Act itself, but understand that descriptors like "Native American" are generally preferable.

[2]     All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3]     Father is not a party to this appeal.

We accept the concession and conditionally reverse the juvenile court's order finding that ICWA does not apply. We remand with instructions for the Agency and the juvenile court to comply with the statutory inquiry requirements.

## BACKGROUND

### A.    *Prior History*

We incorporate from our prior opinion the more detailed background and procedural history of this matter through the contested six-month review hearing held on May 13, 2024. (*In re A.L.* (Jan. 6, 2025, D084095) [nonpub. opn.].)

Briefly, this case commenced in June 2023 following reports of Mother's excessive discipline of Minor that included yelling at, pinching, and hitting Minor. These practices left Minor with bruises and scarring consistent with physical abuse as well as emotional trauma. Mother did not believe hitting a child with a belt or pinching was physical abuse. She said she disciplined Minor the way she was disciplined, which was the way passed down in her culture.

One of Mother's primary goals in the initial case plan was to show that for at least six months she used positive disciplinary methods that do not involve physical or emotional harm to Minor. To facilitate this goal, the plan included a parenting education program, a 52-week child abuse treatment program, and conjoint therapy with Minor when appropriate. The Agency provided Mother with paperwork in August 2023 to enroll in the child abuse group class. Mother thought the program was too long and waited for the court to order her to participate.

At the contested adjudication and disposition hearing in October 2023, the court denied Mother's request to strike the child abuse class from the case

3

plan. The court said the class was "probably the most pivotal part of her case plan given the allegations that the [c]ourt has already found to be true."

The psychologist who evaluated Mother in January 2024 found she met the criteria for delusional disorder as well as a personality disorder not otherwise specified with primary features of paranoid personality, and borderline personality disorders. She exhibited "fixed beliefs of a persecutory nature" which were "primarily related to racial injustice and bias." She had an impaired ability to regulate her emotions, anger, insight, and judgment. She was unable or unwilling to acknowledge her role and responsibility in the removal of Minor or to place Minor's needs ahead of her own. After a discussion with a cultural consultant, the psychologist determined Mother's behaviors were "primarily related to mental health issues and real or perceived traumas" rather than "cultural influences."

The psychologist recommended intense outpatient treatment, medication evaluation, and individual therapy with a therapist who matches Mother's cultural and ethnic background. The psychologist also recommended child abuse prevention classes so Mother could "gain increased awareness and knowledge of the symptomology of abuse, effects of abuse/neglect on children, and develop skills to decrease potential for abuse in the future."

Mother began participating in parenting education in March 2024. She started a child abuse group class at the end of April 2024, just before the contested six-month review hearing. The therapist who facilitated the child abuse class identified red flags from her initial interview with Mother in April 2024, including statements that Mother believed family members were trying to murder her. But the therapist agreed to evaluate Mother's participation in the child abuse prevention group.

B.     *12-month Review Period*

On May 20, 2024, about a week after the contested six-month review hearing, Mother was discharged from the child abuse class.  Her erratic behavior during sessions made several other clients ask to the leave the group because they felt Mother created a hostile environment.  Mother's demeanor cycled from calm to hostile and then to distraught and emotionally dramatic within seconds.  Mother accused both the facilitator and others in the group of racial discrimination.  She also made statements that appeared delusional (e.g., Mother stated she "was in the public eye," she "works with celebrities," and she "has visions and premonitions").  As a result, the facilitator determined Mother was not appropriate to participate in group therapy.  The facilitator recommended that Mother receive individual treatment to stabilize her mental health before returning to a group class.  The social worker provided Mother with referrals for individual therapy and encouraged Mother on numerous occasions to participate.  Mother declined.

Minor returned to Polinsky Children's Center (PCC) on June 6, 2024 because prior caregivers could no longer care for her.  Minor was placed in a resource home on July 10, 2024.

Mother engaged in parenting education through June 22, 2024.  Her visits with Minor were supervised by PCC staff until Mother became upset during a visit on June 29, 2024, which frightened Minor.  After this incident, Mother declined the Agency's offers to arrange visits at a visitation center or with an Agency social worker.

The new caregiver supervised phone visits between Mother and Minor.  Minor told the caregiver she feared Mother and asked the caregiver not to tell Mother about any poor behavior.  The caregiver expressed concern that Mother coached Minor during phone calls, such as by telling Minor not to talk

5

to people involved in the case and instructing Minor not to take prescribed medication.[4]

Mother did not complete a child family team (CFT) meeting in August 2024. She left the call when the group began discussing concerns about Minor's medication, Mother's discharge from the child abuse class, and Mother's lack of participation in therapy. Mother did not respond to attempts to reconnect with her for the balance of the CFT.

In August 2024, after a lengthy absence from the case, Father began participating in the proceedings. He said he wanted Minor and he was willing to do whatever it took to get his daughter back.

At the request of the parents, the Agency continued to explore placement options with relatives or family members out of state. A person Mother suggested for placement in another state was denied approval.

At the scheduled 12-month permanency review hearing, Mother requested a trial on the issues of returning Minor to her care and the terms of the updated case plan which required her to participate in individual therapy.

C.  *Contested 12-month Review Hearing*

The contested hearing occurred on September 16, 2024. The court admitted the Agency reports of September 5 and 16, 2024 with attachments as well as a report from the court appointed special advocate dated September 5, 2024.

The Agency recommended continued reunification services for both parents to the 18-month review date and Minor's continued placement in the

---

[4]    Minor refused to take her medication in August 2024. Minor had a harder time calming down and her behavioral issues increased since she stopped taking the medication.

6

resource home. The Agency clarified that although there were no visits between Minor and Mother from June 29, 2024 to August 28, 2024 due to Mother's schedule, the two visited twice a week over the two weeks before the contested hearing.

Based on the opinions of professional providers, the Agency believed Mother needed to address her mental health issues before she could address the child abuse and physical discipline issues that brought Minor into detention. Since Mother had made no progress with those aspects of her case plan, the Agency believed it would be detrimental to return Minor to her care.

Mother's counsel asked no questions of the social worker and offered no affirmative evidence. Mother's counsel said Mother anticipated completing the parenting class soon and she was "ready to actively participate in therapy at this time." Counsel said the recent visits with Minor were positive and Minor wanted to return to Mother. Counsel asked the court to find it would not be detrimental to return Minor to Mother's care. Alternatively, counsel submitted on the Agency's recommendation to continue services to the 18-month date. Counsel asked the court to modify Mother's case plan to allow her to address the child abuse component in individual therapy.

Minor's counsel conveyed Minor's wishes to live with Mother. However, as the guardian ad litem, counsel believed it was in Minor's best interests to remain with the current caregiver and continue to receive services. Minor's counsel agreed that Mother needed to participate in individual therapy and child abuse prevention before it would be safe to return Minor to her care.

Mother left the proceedings early, saying she needed to get to a class. When Minor asked Mother not to leave, Mother said she would call her later.

The court adopted the Agency's recommendations. The court found the return of Minor to either parent would create a substantial risk of detriment to her safety, protection, and emotional well-being.

The court found Mother had not made significant progress in her case plan. Mother engaged in only a few classes dealing with her mental health needs and she was not a good candidate for a group setting to deal with child abuse classes. Emphasizing that both are "hugely important components of her case plan," the court determined it would not be safe to return Minor to her care. The court found Minor's placement in a licensed foster home was necessary and appropriate.

The court ordered continued reunification services for both parents. The court ordered the Agency to find a therapist for Mother who could provide both individual therapy and components of a child abuse class, noting the 18-month date was in January 2025. Mother appealed.

DISCUSSION

I.

*Substantial Evidence Supports the Juvenile Court's Detriment Finding*

Mother contends there was insufficient evidence for the court's finding that it would be detrimental for Minor to return to Mother's care because the court focused on Mother's progress with her case plan rather than Minor's safety. We disagree.

"The purpose of the California dependency system is to protect children from harm and to preserve families when safe for the child." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.) Because family reunification is the goal throughout dependency proceedings until reunification services are terminated, there is a statutory presumption that a child removed from a parent child will return to parental custody "unless the

8

court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1); *Tracy J.,* at p. 1424.) The Agency bears the burden of establishing that detriment. (*Ibid.*)

The juvenile court must consider "the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided . . . ." (§ 366.21, subd. (e)(1).) The standard for establishing detriment is high. " 'It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial,* such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

We review the court's finding of substantial risk of detriment for substantial evidence. (*Yvonne W., supra,* 165 Cal.App.4th at p. 1400.) "We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling." (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.)

Here, as required by statute, the court considered multiple information sources to arrive at its decision: the Agency reports; the CASA report; the positions of the parties; and Mother's progress with services. After hearing this evidence, the trial court determined that returning Minor to either parent would be detrimental. The court specified the factual basis for its decision by explaining that Mother had not made progress on important

9

aspects of her case plan: addressing her mental health needs and participating in child abuse courses.[5] (§ 366.21, subd. (f)(1)(C).

This is not a situation where a parent's progress in reunification services is simply less than ideal. (See e.g. *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 798 [evidence that a father was poor was not sufficient evidence of detriment when the record showed he participated in services]; *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 [an opinion that a mother failed to internalize lessons from her participation in parenting classes was not sufficient evidence of detriment].) Rather, the record here supports the juvenile court's finding that it was not safe to return Minor to Mother's care without substantial risk to Minor's physical or emotional well-being because Mother has not participated in important aspects of her case plan. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899–900.)

Mother was offered child abuse prevention courses in July 2023. The juvenile court described Mother's participation in these courses as "the most pivotal part of her case plan" due to the allegations of child abuse from excessive discipline. Yet, Mother did not agree to participate in the courses until late March 2024. She completed only three classes by the time of the contested six-month review hearing in May 2024. (*In re A.L.* (Jan. 6, 2025, D084095) [nonpub. opn.].) After the contested six-month hearing, she attended only one more class and was removed from the group because of her behavior.

A detailed report from the child abuse class facilitator shows Mother appropriately participated in only two of the four group child abuse

---

[5] As will be seen, Mother's mental health challenges play a significant role in Mother's inability to manage aspects of her program, including child abuse classes.

10

prevention sessions Mother attended. In the other sessions, her mood rapidly cycled from "well-controlled, to hostile and aggressive towards others, to sweet and cooperative." In the last session, Mother became hostile and aggressive and accused the therapist and other group members of racial discrimination. She later became emotionally dysregulated, cried uncontrollably, and began talking about having visions and premonitions.

The group's facilitator removed Mother from the class not because Mother overshared, but because her mental health issues made the leader and other group members feel unsafe. The therapist concluded Mother needed psychiatric evaluation and treatment to stabilize her mental health issues before she could return to a group session. An Agency psychologist agreed with the assessment. This was consistent with the opinion of the psychologist who evaluated Mother in January 2024. The evaluating psychologist determined Mother's behaviors appeared "primarily related to mental health issues and real or perceived traumas" rather than "cultural influences." Mother's mental health issues impaired her ability to regulate her emotions and impaired her ability to prioritize the emotional needs and safety of Minor. These issues required intense outpatient services, medication evaluation, and individual therapy along with child abuse prevention classes.

Based on these recommendations, the social worker provided Mother with resources for individual therapy. At least six times after discharge from the group class, the social worker encouraged or requested Mother to participate in individual therapy. But Mother disregarded these requests to stabilize her mental health. It was not until the contested 12-month hearing that her attorney indicated for the first time Mother was willing to participate in therapy to satisfy the case plan.

11

Minor loves Mother and wishes to return home. However, there was evidence that Mother's behavior during a recent visit frightened Minor and caused her to cry. Minor's caregiver reported that Minor still fears Mother enough to ask the caregiver not to report Minor's misbehaviors.

Mother did participate in parenting education with a family support partner for a few months. However, her inflexibility for visits prevented her from completing the program. The fact that Mother removes herself from calls or proceedings when concerns are raised about Mother's behavior and progress also supports the finding that it is not yet safe to return Minor to Mother's care.

For all these reasons, substantial evidence supports the court's finding of detriment.

## II.

### *Conditional Reversal is Appropriate for Adequate ICWA Inquiry*

A. *Background of ICWA Inquiries*

At the inception of the case in July 2023, the Agency asked Mother about Native American ancestry. The court also inquired of Mother during an initial hearing. Based on oral histories from her mother's side of the family, Mother reported that the family may have Choctaw heritage. Upon further investigation, both a maternal grandfather and a maternal great-grandmother denied Native American heritage. The Agency sent a letter to a maternal aunt who did not respond. The Agency sent an informal inquiry to several Choctaw tribes. The Choctaw Nation of Oklahoma responded saying Minor is not an Indian child. Responses from the other Choctaw tribes remained pending. Mother also provided a parental notification of Indian status form (ICWA 020) indicating none of the Indian status options applied.

12

A social worker spoke with Father regarding Native American ancestry in September 2023.  He answered "No" to the following questions:  "1. Has anyone in the family ever lived on a reservation?  [¶]  2. Has anyone in the family ever received any financial, medical, or education assistance from a tribe?  [¶]  3. Does anyone in the family speak a Native American language?  [¶]  4. Is anyone active in tribal activities such as tribal council meetings, religious rituals, or powwows?  [¶]  5. Is any family member a member of a tribe or an enrolled member in a tribe?"

The Agency also left a voice message and sent a text to a paternal aunt. There is no indication she responded.

At the contested jurisdiction and disposition hearing in October 2023, the court found without prejudice that there was no reason to believe ICWA applied or that Minor was an Indian child.

After being absent from the proceedings since December 2023, Father recontacted the Agency in mid-August 2024.  Father asked the Agency to evaluate a paternal relative in another state for Minor's placement.  The social worker contacted this family member.

At the contested 12-month review hearing on September 16, 2024, the juvenile court again found without prejudice that ICWA did not apply.

B.    *ICWA Requirements and Analysis*

In California dependency proceedings, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child."  (§ 224.2, subd. (a).)  The Agency's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."  (§ 224.2, subd. (b).)  ICWA defines " 'extended family

13

member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

Further duties of inquiry are required where there is reason to believe a child is an Indian child; and notice is required where there is reason to know a child is an Indian child. (*In re Dezi C.* (2024) 16 Cal. 5th 1112, 1132–1133; § 224.2, subds. (e) & (f).) Alternatively, a juvenile court may "make a finding that an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child, so ICWA does not apply. (§ 224.2, subd. (i)(2)." (*In re Dezi C.,* at p. 1134.) We generally review the juvenile court's ICWA findings for substantial evidence. Where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

Mother asserts, and the Agency agrees, conditional reversal is appropriate for the Agency and the juvenile court to inquire of Father on the record regarding any Indian heritage and to require him to complete an ICWA-020 form. The record also does not indicate the Agency inquired about Indian ancestry with the paternal relative Father identified for placement evaluation. (*In re Dezi C., supra*, 16 Cal.5th at p. 1152.) For these reasons, we agree conditional reversal is appropriate.

14

## DISPOSITION

The September 16, 2024 order is affirmed in part and conditionally reversed in part. We affirm the court's finding regarding detriment to Minor by placing her back in Mother's home, which is supported by substantial evidence. However, with respect to Father, we conditionally reverse and remand the matter to the juvenile court with directions to comply with the inquiry provisions of ICWA and section 224.2, including but not limited to inquiring of Father regarding Native American ancestry, requiring him to complete an ICWA-020 form, and inquiring of extended paternal relatives about possible Native American heritage. If, after completing the ICWA inquiry, neither the Agency nor the juvenile court has reason to know that Minor is an Indian child, the court shall reinstate the findings and orders previously entered on September 16, 2024. If, after an adequate inquiry, the Agency or the juvenile court has reason to know Minor is an Indian child, the juvenile court shall proceed accordingly.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

15